UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED
MAR 30 2007

| | | |
|---|---|---|
| UNITED TRANSPORTATION UNION, | * | CIV 04-4101 |
| Plaintiff, | * | |
| | * | MEMORANDUM OPINION AND |
| vs. | * | ORDER RE: MOTION FOR SUMMARY |
| | * | JUDGMENT AND RENEWED |
| DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION, | * | MOTION TO DISMISS |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff, United Transportation Union (Union), has moved for summary judgment. Doc. 75. Defendant, Dakota, Minnesota & Eastern Railroad Corporation (DM&E), has filed a renewed motion to dismiss contending that the claims raised by Union over the course of this litigation are minor disputes as to which the National Railroad Adjustment Board, or other adjustment board established under the Railway Labor Act, has exclusive and mandatory jurisdiction. Doc. 86. The Court is treating DM&E's motion to dismiss as a motion for summary judgment and granting it in part and denying it in part. The Court is denying Union's motion for summary judgment but allowing Union to reassert this motion within six months regarding its entitlement to a permanent injunction enjoining DM&E from using its qualified managers or the qualified managers of Cedar American to operate business or excursion trains over the rail lines of DM&E.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, United Transportation Union (Union) is the duly designated representative under the Railway Labor Act (RLA). Defendant, Dakota, Minnesota & Eastern Railroad Corporation (DM&E) is a carrier by rail transporting goods in interstate commerce, and is a "carrier" as defined by the RLA. Section 1.24 (crew consist provision) of the April 1, 2003, collective bargaining agreement between the parties (Agreement) provides:

      a.      Except as provided in paragraph (b) below, all crews will consist of an engineer and a conductor.

      b.      Brakemen may be assigned to crews as required by the company's operations.

Prior to June of 2004, DM&E leased and operated three business cars which it had used primarily as passenger or excursion cars for the promotional purposes of educating and entertaining citizen groups, government officials, legislators, potential customers and other interested parties in connection with DM&E's proposal to build a rail line into the Powder River Basin in Wyoming. On May 4, 2004, Chief Executive Officer Kevin Schieffer, who had determined that it was not economically feasible to run the business cars with DM&E crews, sent a letter to Phil Craig, General Chairperson of the Union, proposing a number of options for running the business cars. One of these options was to allow qualified managers to handle business car operations. Craig objected to the use of the qualified managers as being in violation of Section 1.24, the crew consist provision of the Collective Bargaining Agreement. Phil Craig maintained that there could be no unilateral implementation of the matter since it was subject to a pending notice under Section 6 of the Railway Labor Act..

Cedar American, a wholly owned subsidiary of DM&E[1], is a holding company that provides administrative and executive services common to both DM&E and the Iowa, Chicago and Eastern Railroad Corporation (IC&E)[2]. Cedar American has never been an operating railroad, has no collective bargaining agreement with DM&E, and employs no Union members. On June 15, 2004, DM&E entered into agreements with Cedar American to sublease its business cars and lease a DM&E locomotive when necessary to operate a business car train. On June 25, 2004, DM&E entered into another agreement with Cedar American for Cedar American's "operation of non-revenue non-common carrier movements over the rail lines" of DM&E. Cedar American operated its first business car train over portions of the DM&E on June 26, 2004, with qualified managers of Cedar American acting as the crew members. At that time a rested crew of Union members was

---

[1] Cedar American has the same corporate headquarters as DM&E, and the department heads of Cedar American also have jurisdiction over DM&E.

[2] IC&E has a different union than Plaintiff Union.

available and ready to go to work at Huron, South Dakota, the starting point of the June 26, 2004, excursion. Cedar American operated this business car train a total of three times within the week after June 26, 2004.

The qualified managers of Cedar American who acted as crew members of the excursion car train are salaried, whereas the DM&E crew members who operated the business car train are all hourly workers. After the qualified managers of Cedar American operated the business car train in June of 2004, the Union filed this action on July 9, 2004, and filed its first motion for a preliminary injunction.

In his affidavit in opposition to the first motion for a preliminary injunction Shieffer admitted that the Union "has long taken the view that DM&E must use [Union] members to operate these trains, dating back to original discussions in 1997." Craig testified at the July 20, 2004, motion hearing that since he started working for DM&E in 1986, and up until June of 2004, all crews had consisted of an engineer and a conductor, consistent with Section 1.24 of the April 1, 2003, collective bargaining agreement. Craig also testified that previous "non-revenue runs," such as hospital trains, had been operated consistent with Section 1.24 of the April 1, 2003, collective bargaining agreement.

In a Memorandum Opinion and Order dated August 6, 2004, this Court granted Union's first motion for Preliminary Injunction and ordered that pending the required process of bargaining and mediation under the Railway Labor Act, Defendant DM&E be enjoined from using its qualified managers or the qualified managers of Cedar American to operate business or passenger trains over the rail lines of DM&E. This Court concluded that when moving passenger cars for the benefit of DM&E, Cedar American is the alter ego of DM&E. Cedar American is acting at the direction of DM&E, and for the benefit of DM&E

On November 5, 2004, Union moved for a second preliminary injunction, again contending that the Crew Consist provision of the collective bargaining agreement between it and DM&E had been violated by DM&E. The second motion for preliminary injunction was filed largely as a result of DM&E demoting management back to the ranks to run the trains when there was a need for more train crews, and as a result of DM&E using business cars pulled by Brandt Trucks run by truck driver/operators for training purposes. A hearing was held on the second motion for preliminary

injunction on November 19, 2004.

This Court announced its decision from the bench denying the second motion for preliminary injunction. In a written decision and order entered subsequent to the decision from the bench, the Court explained that the dispute involving the use of former managers who have been demoted and have exercised their train and engine service seniority as engineers and conductors is arguably comprehended within Section 1.17 of the parties' Agreement. The Court also determined that there was evidence that the Brandt Truck was being used in a "maintenance of way" capacity. The Court, therefore, concluded that DM&E's argument that the Agreement and past practices of the parties allows the Brandt Truck to be operated by employees other than those listed in the crew consist provision was neither frivolous nor obviously insubstantial. Consequently, the Court concluded that these disputes constitute minor disputes subject to compulsory and binding arbitration before the National Railroad Adjustment Board or an adjustment board established by the employer and unions representing the employees, such boards having exclusive jurisdiction over minor disputes. *See Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978). In footnote 6 to the Union's Memorandum in Opposition to DM&E's Renewed Motion to Dismiss (Doc. 96) the Union states that is "believes the Court has addressed [the Brandt truck and demoted manager] arguments in the prior proceedings in this action, and [Union ] does abandon them."

At the time Union filed its second motion for preliminary injunction, Union also moved to add a new count to the original complaint . Doc. 39. At the hearing on the second motion for preliminary injunction, counsel for DM&E advised that it was not resisting the motion, and Union's request was granted. Doc. 61. In April of 2006, Union moved to file a second supplemental pleading to set forth events that had occurred since the filing of the original and first supplemental complaint. DM&E responded that it would not formally oppose the motion for leave to file a second supplemental pleading, and would reserve all defenses including subject matter jurisdiction as DM&E contends that all claims set forth in the second supplemental pleadings constitute minor disputes under the Railway Labor Act. The motion requesting leave to file a second supplemental pleading was granted..

The second supplemental complaint contains allegations concerning DM&E managers C.L. Werner and Corby Meyer working on crews at the direction of DM&E chief Transportation Officer

Richard D.Awe. Awe sent an August 25, 2004, memorandum to DM&E Train and Engine Service employees stating that due to "business levels in current operational needs" Meyer and Werner would be placed in rotation on the DM&E Rapid City Crew Board, and that "there may be issues and concerns, but please understand this is necessary to retain business and serve our customers." The second supplemental complaint alleges that although Craig objected to Awe's memorandum on August 26, 2004, on the ground that the use of the management employees to fill train crews with management employees violated the crew consist provision of the parties' agreement, DM&E has continued to run train service using management employees.

Union has contended that Meyer and Werner had not left their management positions as required by the collective-bargaining agreement to exercise their train and engine service seniority when they served as crew on August 9, 2004 and October 25, 2004. In the written decision denying the second motion for preliminary injunction the Court stated that there were insufficient facts before the Court to determine whether the disputes concerning the use of managers as train crew on August 9, 2004 and October 25, 2004, constituted either a major or minor dispute under the Railway Labor Act or a violation of the Order granting Union's first motion for Preliminary Injunction.

The second supplemental complaint also contains an allegation regarding an incident that occurred subsequent to the Court denying the second motion for preliminary injunction. Union alleges that on November 28, 2005, in the Rapid City yard, DM&E filled the conductor and brakemen positions with management employees, Werner and Meyer. When Craig, on the Union's behalf, objected to the use of management employees, DM&E responded by claiming that it had to use management employee because there were no employees available to fill these positions.

In its motion for summary judgment Union contends that for the same reasons it received a preliminary injunction in its favor it is entitled to a permanent injunction with regard to DM&E using its qualified managers or the qualified managers of Cedar American to operate business or passenger trains over the rail lines of DM&E. Union also contends that it is entitled to summary judgment on its claims that DM&E's actions on August 9, 2004, October 25, 2004, and November 28, 2005, clearly violated the status quo provisions of the Railway Labor Act by not conforming to the crew consist provision of the parties' collective bargaining agreement. In its renewed motion to dismiss, DM&E contends that all the claims presented by Union constitute minor disputes, and as such, this

Court does not have subject matter jurisdiction over the claims.

When DM&E submitted the original motion to dismiss, it moved in the alternative for summary judgment. Doc. 23. Since the Court has been presented with and considered matters outside the pleadings, the renewed motion to dismiss may be treated as a motion for summary judgment. *See* FED. R. CIV. P. 12(b). Also, if a party in a motion to dismiss make a factual attack on the jurisdictional allegations of a complaint, the court may receive competent evidence such as affidavits, deposition testimony, in-court testimony and the like in order to determine the factual dispute. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947)).

Principles Regarding Motions for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[3]

## WHETHER THE DISPUTES IN THIS CASE ARE MAJOR DISPUTES SO AS TO ALLOW THIS COURT TO EXERCISE SUBJECT MATTER JURISDICTION AND ENJOIN VIOLATION OF THE STATUS QUO?

General Principles in Determining Whether Dispute is Major or Minor

One purpose of the Railway Labor Act to is to prevent the disruption of the Nation's rail service and to avoid any interruption to commerce by requiring both the union and the railroad to negotiate whenever a dispute arises. 45 U.S.C. § 152. In the event of a major dispute, the parties are required to undergo a lengthy process of bargaining and mediation, and the parties are obligated to maintain the status quo. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989). In maintaining the status quo, the railroad may not implement contested changes in pay, rules or working conditions. *See* 45 U.S.C. § 152 Seventh and § 156. The federal district courts have subject-matter jurisdiction to enjoin violations of the status quo pending completion of the required bargaining and mediation without the customary showing of irreparable injury. *See Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142 (1969).

If, however, the dispute is categorized as a minor dispute, or a dispute arising "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," the dispute is subject to compulsory and binding arbitration before the National Railroad Adjustment Board or an adjustment board established by the employer and unions representing the employees, and these boards have exclusive jurisdiction over minor disputes. *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978). When the dispute is minor, a party may make small alterations in working conditions unilaterally, pending resolution of the dispute in mediation. *Alton & Southern Lodge No.306 Brotherhood Ry. Carmen v. The Alton & Southern Ry. Co.*, 849 F.2d 1111, 1113-114 (8th Cir. 1988).

A determination of whether a dispute is major or minor depends on whether the dispute is

---

[3]Local Rule 56.1(A) requires that the moving party for summary judgment submit a Statement of Undisputed Material Facts with the motion. The Court notes that no Statement of Undisputed Material Facts has been filed in this case.

arguably comprehended within the parties' agreement. *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R. Co.*, 802 F.2d 1016, 1022 (8th Cir. 1986). The Court must, therefore, determine the terms of the parties' agreement, and this includes both the written collective-bargaining agreement and the past practices of the parties. *Id.* In determining the terms of the agreement, however, the court "'need not interpret the terms of the agreement."*Id., cited in United Transp. Union v. Kansas City S. Ry. Co.*, 172 F.3d 582, 586 (8th Cir. 1999). Rather, the purpose of the inquiry "'is to determine whether [the] case implicates a question of contract interpretation.'" *Id.*

In determining whether a past practice has risen to the level of an implied agreement, it must have "'ripened into an established and recognized custom between the parties.'" *Brotherhood Ry. Carmen v. Missouri Pac. R.R. Co.*, 944 F.2d 1422, 1429 (8th Cir. 1991)(quoting *Alton*, 849 F.2d at 1114). The Eighth Circuit has also concluded that in order for a past practice to rise to the level of an implied agreement, the practice must be with the knowledge *and* acquiescence of the employees. *Brotherhood Ry. Carmen*, 944 F.2d at 1429

The Supreme Court has explained, "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective -bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Consolidated Rail Corp.*, 491 U.S. at 305. There is no bright line for differentiating between major and minor disputes and the issue is often a question of degree which turns upon the facts of each case. *United Transp. Union v. Kansas City S. Ry. Co.*, 172 F.3d at 585. When the circumstances surrounding a dispute are ambiguous, the courts favor construing the disputes as minor. *Id.* at 1113. The formal demarcation between major and minor disputes, however, does not depend on a case-by-case determination of the importance of the particular issue presented or the likelihood that the particular controversy would prompt the exercise of economic self-help. *Consolidated Rail Corp.*, 491 U.S. at 305. DM&E bears the "relatively light burden" of establishing that its actions are at most minor changes which are within the status quo. *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R. Co.*, 802 F.2d at 1022.

<u>The Crew Consist Disputes of August 9, 2004, October 25, 2004, and November 28, 2005</u>

In the early morning hours of August 9, 2004, a train derailed at the Rapid City yard. At 5:00a.m.an engineering crew came in to rerail the cars and repair the track. The crew caller called the regularly scheduled 7:00 a.m. crew to come in early, but only one of the crew members answered the call. The crew caller then called the other rested engineers at Rapid City, but none of the rested engineers answered the call. So the use of the Rapid City yard could be restored C.L. Werner acted as engineer for approximately two hours. When the regularly scheduled 7:00 a.m. crew arrived, C.L. Werner returned to his normal management responsibilities.

On October 25, 2004, C.L. Werner served as an engineer for several hours when the conductor who regularly worked the 6:30 p.m. yard job at Rapid City was working another job and the crew caller was unable to reach another rested conductor. C.L. Werner had been demoted from his management position on August 30, 2004, and had worked full time as an engineer from September 2, 2004, through October 18, 2004, to accommodate a shortage of engineers due to a larger than anticipated fall harvest. Werner had been promoted on October 18, 2004, to Manager of Train Operations at Rapid City and was serving in this management position at the time he worked as a conductor on October 25, 2004.

On the morning of November 28, 2005, after a significant snow had fallen overnight in Rapid City, the crew caller called every rested conductor, but the conductors either failed to answer their telephones or advised that they could not get to work. Corby Meyer, Supervisor of Locomotive Engineers, filled in as a conductor for several hours, and C.L. Werner assisted on the ground for a shorter period of time to complete work so that operations at the Bentonite Plants at Colony, Wyoming would not be interrupted.

In his corrected second affidavit, C.L. Werner states:

> From time to time on past occasions, DM&E has used managers to work as engineers or conductors in emergency situations. This is especially true at Rapid City on the Colony Line because it is a very small and geographically-isolated terminal. In such cases, the manager worked only until a regular crew member was rested and available, and no engineer was denied any work because no rested and available engineer responded to the call.

Werner's affidavit makes no specific reference to the use of managers as engineers or conductors outside of the dates of August 9, 2004, October 25, 2004, and November 28, 2005. In

9

Phil Craig's affidavit of August 7, 2006, he states that there "has been no past practice whatsoever of management employees operating trains on DM&E under any circumstances" since Craig held office in the Union from 1994 to the present.

Although DM&E maintains that past practice justifies the use of management on train crews for sharply limited times under emergency operating conditions, in order for a past practice to rise to the level of an implied agreement, the practice must be with the knowledge *and* acquiescence of the employees. *Brotherhood Ry. Carmen*, 944 F.2d at 1429. On the record before it, the Court cannot conclude that this alleged past practice rises to the level of an implied agreement. There is no showing of acquiescence of the employees.

Article 1.22 of the Collective Bargaining Agreement provides the contractual procedure for filling both permanent and temporary vacancies. Article 1.22 provides that temporary vacancies in conductor, engineer or brakemen positions are to be filled by the first out qualified extra board conductor or engineer from the nearest extra board point. This section further provides that temporary vacancies which are unable to be filled pursuant to this section are to be filled under the provisions of Appendix D to the Agreement. Appendix D to the Agreement lists the order in which available conductors and engineers will be called to fill temporary conductor and engineer vacancies. Appendix D does not address what is to be done in the event that no available employee from the sources listed responds to a crew call or reports for duty. DM&E argues that the only fair and reasonable inference that can be made from the failure of the Agreement to specifically address such a situation is that management is free to call any other qualified employee, including a management employee.

DM&E contends that its argument that management is free to call a management employee when no available employee from the sources listed in Exhibit D responds to a crew call is consistent with Article 1.17. Article 1.17 provides in part, "An employee promoted to an official position with the Company or the Organization will retain and continue to accumulate seniority in all crafts where seniority is held." DM&E further contends that the most reasonable interpretation of the Agreement is that after all the groups of employees listed in Exhibit D have been called but none have responded or been available, the next source of employees would be management employees who have continued to accumulate seniority.

10

DM&E further argues that even in the absence of Article 1.17, DM&E has the right to use managers in the three situations under Article 2.1. This section provides: "The Company reserves the right to alter, modify or issue new policies or procedures that are not in conflict with those contained herein, and to otherwise operate its business in any manner that is not in conflict herewith."

DM&E points out that after Richard D. Awe sent the August 25, 2004, memorandum stating that due to" business levels in current operational needs" Meyer and Werner would be placed in rotation on the DM&E Rapid City Crew Board, Craig responded in his August 26, 2004, memorandum that Exhibit E to the Agreement applied. Exhibit E contains provisions which apply to allow "DM&E to protect a temporary increase in business that cannot be protected with the work force at a crew board point." Although DM&E contends that Craig was acknowledging that the Agreement covered the use of management employees on the three dates in issue, the Court is reluctant to construe Craig's correspondence as a concession that the Agreement covered the situations presented on August 9, 2004, October 25, 2004, and November 28, 2005. The correspondence addresses the use of former managers who were returned to the ranks on less than a full time basis.

However, even in the absence of a concession from Union, this Court concludes that the dispute regarding the use of management as crew on August 9, 2004, October 25, 2004, and November 28, 2005, is arguably comprehended within the parties' agreement. In light of the temporary vacancies provisions in the Agreement, this Court cannot conclude that DM&E's claim that the action it took on the three dates in issue was justified by the terms of the Agreement is frivolous or obviously insubstantial. Having determined that the situations presented on August 9, 2004, October 25, 2004, and November 28, 2005 constitute a minor dispute, this dispute is subject to compulsory and binding arbitration before the National Railroad Adjustment Board or an adjustment board established by DM&E and the Union. *See Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978). Union's motion for summary judgment is denied with respect to this dispute and DM&E's motion to dismiss or alternative motion for summary judgment regarding jurisdiction over

this dispute is granted.[4]

<u>Whether the Excursion Trains Issue Constitutes a Major Dispute and Whether a Permanent Injunction is Warranted on this Issue</u>

DM&E asserts that the standard for a permanent injunction is quite different than that for an injunction pendente lite, and since Union has submitted no additional evidence or argument with respect to the excursion trains issue, Union's prior showing does not meet this higher threshold for a permanent injunction. Union asserts that since the Court entered its order granting a preliminary injunction "nothing has changed with respect to this dispute[5]." Although neither DM&E nor Union have contended that discovery is not complete on this issue or that a further hearing is required before the Court determines whether to grant the permanent injunction, the record is not complete on the permanent injunction issue, in part because of the absence of a statement of undisputed material facts and response thereto.

Although the Court in issuing the preliminary injunction concluded that the dispute regarding the operation of excursion trains was a major issue, in renewing its motion to dismiss, DM&E contends that the Court did not address the meaning or impact of the management rights clause in of Article 2.1 of the Agreement. DM&E, relying on *Railway Express Agency, Inc. v. Brotherhood of Ry., Airline and Steamship Clerks*, 437 F.2d 388 (5th Cir. 1971), maintains that other courts have found similar clauses dispositive of whether the dispute is major or minor.

---

[4] DM&E also argued that its use of management employees on August 9, 2004, October 25, 2004, and November 28, 2005, was justified based on the "time-honored and thoroughly established industry understanding that railroads are excused from strict application of bargaining agreements to the extent necessary to respond to emergencies."DM&E provided copies of arbitration awards that it contends support its position. Union contends that the decisions relied upon by DM&E are factually distinguishable form the case at hand in that most of cases had emergency provisions in their collective bargaining agreements. Having found that the dispute involving the use of management employees on August 9, 2004, October 25, 2004, and November 28, 2005, was arguably justified by the terms of the parties Agreement, this Court need not determine whether the situations presented constituted emergencies nor must it address DM&E's industry practice argument.

[5] In Phil Craig's third supplemental declaration, Craig asserts that during collective bargaining negotiations in 2006, DM&E proposed to eliminate the crew consist provision of the Agreement.

12

The *Railway Express Agency* case, involving a labor dispute over an airline having certain air express transfers at a particular local airport done by the airline's employees, however, is factually distinguishable from the case at hand. The Fifth Circuit in that case relied significantly on nationwide past practices in a nationwide agreement in determining the scope of the agreement and the breadth of management's prerogative. 437 F.2d at 392. In the case at hand, DM&E's Chief Executive Officer Kevin Shieffer admits in his affidavit of July 15, 2004, "The United Transportation Union (UTU) has long taken the view that DM&E must use UTU members to operate these trains, dating back to original discussions in 1997." In this Court's Memorandum Opinion and and Order granting the preliminary injunction, this Court held that the past practice of having qualified managers accompany an engineer and conductor on the business car trains, however, was dissimilar to the practice in controversy regarding a factor critical to the excursion car dispute - the *replacement* of the union train crew by nonunion managers. This Court maintains this position.

The Court in its August 6, 2004, opinion did address DM&E's management rights clause argument. Doc. 34, p.5. After considering the cases relied upon by DM&E in support of its argument, the Court rejected the argument. Likewise, the Court considered and rejected DM&E's position that the dispute was minor because it involved business or excursion cars as opposed to the revenue producing portion of the railroad. Doc. 34, p.6.

In *Detroit & Toledo Shore Line Ry. Co. v. United Transportation Union*, 396 U.S. 142, 1535 (1969), the Supreme Court held that the status quo provisions of the Railway Labor Act [6]obligate

---

[6]§ 6 of the Railway Labor Act, 45 U.S.C. § 156, along with § 5 First and § 10, 45 U.S.C. §§ 155 First, 160, comprise the status quo portions of the Act. *Detroit & Toledo Shore Line Ry. Co. v. United Transport. Union*, 396 U.S. at 299n.14.

    45 U.S.C.A. § 156 provides:
> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally

both union and management to maintain not only the working conditions contained in an existing collective bargaining agreement, but also "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute."

DM&E maintains that no bargaining agreement provision requires Union-represented crews on these excursion trains because these trains are occasional, are non-revenue producing, and are unrelated to the normal operation of the railroad. DM&E further contends that a permanent injunction is not warranted because the operation of excursion trains by DM&E and Cedar American does not threaten to take away Union jobs. DM&E explains in its supporting memorandum, "The occasional operation of an excursion train is simply outside the scope of the bargaining agreement." Union had maintained the position that the excursion or business cars were to be operated by Union employees long before this dispute arose.

Since DM&E has presented evidence that the excursion cars are used for the promotional purposes of educating and entertaining citizen groups, government officials, legislators, potential customers and other interested parties regarding DM&E's proposal to build a rail line into the Powder River Basin, it appears that the excursion cars are not directly producing revenue but that activity does appear to be related to the normal operation of the railroad. This is not taking

---

acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

Union also relies upon 45 U.S.C. § 152 First, which provides:
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

Union further relies upon 45 U.S.C. 152 Seventh, which provides:
No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

14

dignitaries out on a lark, but instead is a part of the very core of the proposed and contested extensive expansion of DM&E. More importantly, neither the parties' Agreement nor its past practices justify DM&E unilaterally changing the crew consist provision's requirement that "all crews will consist of an engineer and a conductor," based upon DM&E's determination of the profitability of the excursion trains.

In conclusion, this Court continues to find that the parties are subject to the Railway Labor Act, and the dispute involving DM&E's use of qualified managers of DM&E and Cedar American to run excursion cars is a major dispute over which this Court has jurisdiction. The Court further finds that DM&E violated the mandatory status quo provisions of the Railway Labor Act. The record has not been developed, however, with regard to whether a permanent injunction is necessary on the excursion train issue to prevent further violations of the mandatory status quo provisions of the Railway Labor Act.[7] Although the Court is at this time denying Union's motion for summary judgment as it relates to the issuance of a permanent injunction, the Court is allowing Union to renew its motion with appropriate evidentiary support on this point within six months of the date of this Memorandum and Order. If such a motion is made and either or both of the parties maintain that a hearing is required before a permanent injunction is again considered, they should advise the Court of their position and explain the basis of their position within this six-month time frame. Accordingly,

**IT IS ORDERED:**

1. That Union's Motion for Summary Judgment (Doc. 75) is denied at this time with regard to whether Union is entitled to permanent injunctive relief in the dispute involving DM&E's use of qualified managers or the qualified managers of Cedar

---

[7] Although the Court notes that there has been extensive publicity regarding the past and future plans for the funding of the Powder River Basin project, the record in this case does not disclose whether DM&E plans to use the excursion trains to generate funding for the Powder River Basin project or for any other purpose. The publicity mentioned above has indicated that government funding of the Powder River Basin Project has been denied but that private lending will be sought. None of this is in the record for this case let alone whether there will be future use of excursion trains and with what crews.

American to operate business or excursion trains over the rail lines of DM&E. Plaintiff may renew its motion and provide appropriate support with regard to a permanent injunction regarding the excursion train issue within six months of the date of this Order. If either or both of the parties maintain that a hearing is required before a permanent injunction is considered regarding the excursion train dispute, they should advise the Court of their position and explain the basis of their position within this six-month time frame.

2. That DM&E's renewed motion to dismiss (Doc. 86) is treated as a motion for summary judgment and is granted with regard to all of Plaintiff Union's claims excluding the claim regarding the dispute involving DM&E's use of qualified managers or the qualified managers of Cedar American to operate business or excursion trains over the rail lines of DM&E.

Dated this 30th day of March, 2007.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
DEPUTY

16